227 P.2d 219

**MURPHY v. NATIONAL IRON & METAL CO.**

No. 5038.

Supreme Court of Arizona.

Jan. 29, 1951.

324

Frank W. Beer, Hess Seaman, of Phoenix, for appellant.

Snell & Wilmer, of Phoenix, for appellee.

PHELPS, Justice.

D. K. Murphy, appellant, and the National Iron and Metal Company, a corporation, appellee, who will hereinafter be referred to as plaintiff and defendant respectively, were engaged in the scrap metal business in Phoenix in 1946 and had been for many years. In August of that year plaintiff agreed to sell, and defendant agreed to buy, certain scrap metal belonging to plaintiff, a part of which was aluminum scrap salvaged from airplane parts including turrets, airplane fixtures, wings, A-frames and a large number of cases of purported aluminum scrap. Samuel Shapiro was the manager and sole owner of the defendant corporation and transacted all business with plaintiff connected with the sale and purchase of the scrap metal here involved.

Defendant claims that plaintiff then stated to it that the A-frames were made of aluminum and also that there was a lot of clean aluminum in the boxes and cases and that about one-half of the entire lot was clean aluminum. Plaintiff denies that he made any statement concerning the quality or percentage of aluminum content but that he did tell Shapiro that the scrap shown him consisted of clean and dirty aluminum. After looking over the yard a price of $25 per ton was agreed upon for the aluminum scrap subject, however, to inspection by defendant. In addition to the express agreement for inspection by defendant it is the prevailing custom in the scrap metal business that all scrap metal is bought sub-

ject to inspection at the time of its delivery and that such inspection and weights govern and that the seller is paid upon the classification given it upon inspection. According to Shapiro's testimony this price was agreed upon because about half of the scrap "contained these turrets." Nothing was said as to what order the different kinds of scrap pointed out to defendant should be delivered. Plaintiff began delivery of aluminum scrap and when about one-half of it had been delivered, inspected and accepted by defendants a load of scrap consisting largely of an A-frame was delivered to defendant by plaintiff. It was found upon inspection to contain 1300 pounds of steel and only 1100 pounds of aluminum scrap. Defendant then notified plaintiff that the A-frames were supposed to have been aluminum scrap but that the one just delivered was not and that defendant could not use it. Defendant did offer, however, to pay $9 per ton for the steel which offer was accepted by plaintiff. This load was accepted by defendant and credit given plaintiff at the rate of $25 per ton for the aluminum scrap and $9 per ton for the steel.

At that time Shapiro informed plaintiff he could not take any more turrets and that he would have to have the clean aluminum. After some further attempt to settle their differences defendant refused to receive further deliveries and refused to pay for the deliveries made and according to his testimony offered to return the scrap metal delivered to the plaintiff which plaintiff refused to accept. Plaintiff denied this offer was made. Thereupon plaintiff brought this action in the superior court of Maricopa County seeking recovery of the agreed purchase price for the scrap metal delivered to that date. Judgment was entered for defendant and plaintiff appeals. He assigns as error that the judgment is not justified by the evidence and is contrary to the law.

It is the contention of defendant that it purchased the aluminum scrap from plaintiff upon an express warranty that it was of a certain quality, to wit, that the entire quantity of aluminum scrap purchased would be at least 50% clean aluminum. As above stated plaintiff denies making such a statement. Counsel both for plaintiff and defendant have devoted considerable space in their briefs to a discussion of the character of warranties express and implied and the legal effect of inspection or the opportunity to inspect the goods purchased both in the case of express and implied warranties. We are of the opinion that it will not be necessary to consider this phase of the law because we do not believe the evidence shows defendant relied upon either an express or an implied warranty in the transaction under consideration.

The record does not disclose upon what theory the trial court proceeded in rendering judgment for defendant. Suffice it to say, however, that we fail to find any sub-

stantial evidence in the record to support the judgment. Shapiro testified in substance that plaintiff called him and told him he had considerable scrap metal out at his yard he wanted cleaned up and asked him to stop by. That afternoon on his way home Shapiro stopped by the plaintiff's yard and together with plaintiff went over the yards looking over the different kinds of scrap metal he was offering for sale including the aluminum scrap here involved. (Plaintiff also had copper, brass and other scrap metals which he wanted to sell to defendant at that time.) The aluminum scrap consisted of quite a few large boxes or cases 3 to 4 feet square, airplane wings and turrets and what is described as an A-frame which was likewise a part of an airplane; that between plaintiff and defendant it was figured there was a total of about 25 tons of this aluminum scrap; that about half would consist of the turrets and the other half would consist of what would be called clean aluminum. He further testified that about 75% of the turrets was foreign material and only about 25% aluminum; that there was about 40 different alloys of aluminum and that airplane aluminum is in the lower brackets because it consists of many different alloys put together; that he (Shapiro) had been purchasing airplane aluminum of the same character right along. He testified however that airplane aluminum is classed as clean aluminum. Both Shapiro and Murphy had been in the scrap metal business for about 10 years. Shapiro testified that a man in the business ought to know what clean aluminum is. Defendant's business in scrap metal runs from $700 thousand to $1 million per year.

The fact that both plaintiff and Shapiro are experts in the scrap metal business is most persuasive against the contention by anybody that either relied upon any representation made by the other as to the quality of the scrap metal being sold or purchased from one by the other. The following questions asked Mr. Shapiro by his counsel and his answers thereto make it unnecessary to draw any inferences as to what transpired between them at the time the sale was made. The testimony speaks for itself.

"Q. Mr. Beer asked Mr. Murphy as to whether or not there was any custom in representing what materials consisted of in the business of buying scrap metals. Will you tell the court just in what fashion the industry does conduct its purchase and sale of materials? A. The prevailing custom, when material is bought, it is subject to inspection at the time of its delivery, its inspection at the time of delivery, and the weights govern.

"Q. If you ship a carload of scrap metal to the coast, on what are you paid? A. We are paid on their classification." (Objection and argument.)

"Q. Could you tell us, Mr. Shapiro, whether or not, or could you tell us ap-

proximately, out of this particular area, the amount of materials of this character that were bought and sold on that type of business dealing? A. All the materials we sell is sold that way; all that we buy is bought that way.

"Q. What is the approximate value of that business? A. We handle between 700 thousand and a million dollars a year.

"Q. Is that true of the industry generally? A. That is true."

And again later on this question was asked:

"Q. In your business, Mr. Shapiro, when you go into a yard to buy material, is it customary, if you buy something for copper scrap, to root through the whole heap, or do you take his word for it? A. When we buy material, if he tells us it is copper, we sort it and pay for it; if it is copper he is paid for copper; if it is brass, he is paid for brass."

The custom to which Shapiro testified as prevailing in the scrap metal business completely refutes the claim that defendant relied upon plaintiff's warranty as to the quality of the scrap metal purchased. Reliance upon a warranty is a prerequisite to the recovery for a breach of warranty. Van Deren Hardware Co. v. John H. Preston & Son, 224 Ky. 170, 5 S.W.2d 1052, 64 A.L.R. 881. And later on the witness Shapiro had the following to say:

"Q. When this load that we referred to as the last load came to your place were you there at the time at the scales? A. I came in after the load had already gotten in.

"Q. What did you do? A. When Mr. Hodesh told me what had happened that he discovered these parts were made of steel and not aluminum, I called Mr. Murphy on the phone.

"Q. When you say 'these parts,' why do you make reference to 'these parts?' A. These parts we are talking about consisted of a stand about four feet high, kind of an A-frame. It was painted in the light green color that all the airplane parts are painted when handled in the plant.

"Q. Had you seen these parts in Mr. Murphy's yard? A. I had seen a few of them.

"Q. Had you had any specific conversation with him about them? A. He told me they were made of aluminum.

"Q. Did you examine them further? A. No, I didn't.

"Q. Then when the load came in and Mr. Hodesh told you they were not aluminum but iron, what did you do? A. I called Mr. Murphy on the phone and told him these parts were supposed to have been aluminum but were not, and we couldn't use it. He said they were loaded when he wasn't there. He asked what would we pay for them. I said we could pay nine dollars a ton for steel, and he said that was all right.

"Q. Do you know whether a large portion of any other parts that were there were of that same character? A. I was told there was the same kind in the cases.

"Q. By whom? A. By Mr. Murphy.

"Q. Then what did you say about going ahead with the deal? A. I told him I couldn't take any more turrets, I would have to have the clean aluminum, that is why I made the deal.

"Q. What did he say? A. He said he had some clean aluminum in the yard, to come and look at it. I went there in the evening and drove around the yard and saw there wasn't much of aluminum there, and that the wings that were supposed to have been delivered to us were still fastened in the ground.

"Q. Did you have any other conversation with Mr. Murphy about this transaction? A. Yes.

"Q. When was that? A. Oh, several days later.

"Q. Where was it? A. At our place of business.

"Q. He came to see you did he? A. Yes.

"Q. Do you remember who was there? A. I believe it was he and I.

"Q. Tell us what that conversation was. A. I told him I couldn't use the lot and since I didn't get the clean aluminum with the turrets, I didn't want them. He told me he was out of pocket the cost of bringing the turrets down to the yard, and I told him since he was at the expense of bringing it to the yard, we would load it on our trucks and return it to him at no cost to him, and consider the deal closed."

We are of the opinion that even were we to accept the view that plaintiff did warrant that the material purchased would contain at least 50% of clean aluminum, when defendant reserved the right to inspect and did inspect that portion of the material that was delivered and gave the plaintiff credit therefor as shown by the weights in evidence in the case, such action constituted an acceptance of the portion delivered and he was thereafter in no position to repudiate such acceptance and refuse to pay in accordance with the terms of the contract. The testimony of Mr. Shapiro as shown above conclusively shows that even the last load delivered by plaintiff was accepted by defendant and the price as to the aluminum scrap reaffirmed and the price of $9 per ton was agreed upon for the 1300 pounds of steel it contained.

Again if we accept the view of the existence of such warranty, if the portion delivered did not contain the percentage of aluminum for which defendant claims it contracted, it was at liberty to refuse to accept it. This it did not do. In the absence of an agreement to the contrary plaintiff had the right to deliver the material purchased in whatever order he deemed proper or convenient. If after all of the material had been delivered it was

found by defendant that in gross it did not contain the percentage of clean aluminum which it claims the plaintiff warranted it to contain, it then had its remedy in court on such warranty. But until it was determined by an inspection of all of the material purchased that it did not contain an aluminum content of at least 50% clean aluminum in compliance with such warranty defendant could not repudiate its contract. There is no evidence in the record anywhere that the wings that were yet in the yard did not consist of clean aluminum. On the other hand Mr. Shapiro testified that airplane wings do consist of clean aluminum. No inspection was made as to whether or not the large cases to which defendant refers in its testimony contained clean aluminum. The burden was upon the buyer to prove that the entire lot of scrap metal purchased did not contain at least 50% of clean aluminum before it may defend upon a breach of warranty. Mills v. Maxwell Motor Sales Corp., 105 Neb. 465, 181 N.W. 152, 22 A.L.R. 130; Hurricane Milling Co. v. Steel & Payne Co., 84 W.Va. 376, 99 S.E. 490, 6 A.L.R. 637.

 Shapiro knew that turrets were not clean aluminum but as he expressed it they contained "contaminated aluminum," which he said was not sufficient to pay for cost of removal. Defendant agreed to purchase these turrets because plaintiff desired to clean up his yard. Shapiro's previous purchases and sales of this airplane aluminum scrap and his long experience in the scrap metal business placed him in a position to know of what airplane materials consisted and he unquestionably did know as much about its content as the plaintiff did. Section 52–512, A.C.A. 1939, defines express warranties as "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty *if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. * * *"* (Emphasis supplied.)

Shapiro frankly admits that anyone engaged in the aluminum scrap business ought to know what clean aluminum is. He knew gun turrets were not clean aluminum. He was asked the question:

"Q. You are expert at the business, you know junk when you see it? You know aluminum when you see it? A. Yes, I do."

He said he knew there were gun turrets, A-frames and airplane wings as well as the large square cases containing aluminum scrap. He saw all of these things in plaintiff's scrap yard. He must have known their aluminum content from having purchased them "right along." It follows that if he knew their content he did not rely upon plaintiff's warranty of such content. If he did rely thereon he had no right to do so. The statute makes it a condition precedent to a recovery upon a warranty

330

as to the quality of goods sold that the purchaser must have relied upon such warranties. Before a purchaser can rely upon a warranty or a representation he must believe it to be true. Knowing it to be untrue negatives any belief that it is true and necessarily any right to rely upon its truth. We therefore hold that Shapiro, as an expert, dealt at arms' length with plaintiff and did not rely upon any warranty of plaintiff as to the quality of aluminum scrap purchased. We further hold that regardless of whether plaintiff expressly warranted the quality of the aluminum scrap defendant, having reserved the right to inspect it and pay for it according to the prevailing custom and having inspected and accepted the scrap metal delivered to it by plaintiff, is bound by such action to pay for the same at the price agreed upon. Especially is this true in view of the fact that nowhere in the record is there any evidence that the undelivered portion of the scrap metal purchased by defendant from plaintiff did not consist of clean aluminum.

For the various reasons above set forth, judgment reversed with directions to enter judgment in favor of plaintiff as prayed for.

UDALL, C. J., and STANFORD, DE CONCINI and LA PRADE, JJ., concurring.